**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BNSF RAILWAY COMPANY,** | ) | |
| **a corporation,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** <u>3:15-cv-01029-</u>M |
| | ) | |
| **INTERNATIONAL ASSOCIATION** | ) | |
| **OF SHEET METAL, AIR, RAIL AND** | ) | |
| **TRANSPORTATION WORKERS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF BNSF RAILWAY'S BRIEF IN SUPPORT OF ITS MOTION FOR A**
**TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

**Introduction and Summary** ...................................................................................................5

**I.      Statement of Facts** ....................................................................................................7

A.    The Parties...............................................................................................................7
B.    Collective Bargaining Agreement Governing Pay for On-Call Time .......................7
C.    Calculating Pay for On-Call Time ("Guarantees") ................................................8
D.    BNSF's Past Practice of Computing Guarantees ...................................................8
E.    The Union's Position ..............................................................................................9
F.    The Threatened Work Stoppages ..........................................................................10
G.    The Balance of Harms ..........................................................................................10

**II.      Argument** ...............................................................................................................12

A.    Applicable Legal Principles for Classification of Rail Labor Disputes ..................12
B.    The Parties' Dispute in This Case is Minor ..........................................................17
      1.   The Language of the CBA Supports BNSF's Method of Calculating Guarantees...............17
      2.   Past Practice Supports BNSF's Method of Calculating Guarantees....................................18
      3.   Therefore, these disputes are clearly minor and must be resolved under the RLA ..............18

C.    The Balance of Harms and Public Interest..............................................................19

**III.      Conclusion**................................................................................................................22

## TABLE OF AUTHORITIES

### CASES

*AFA v. Horizon Air Indus., Inc.*, 280 F.3d 901 (9th Cir. 2001)................................16

*AFA v. United Airlines*, 976 F.2d 102, 105 (2d Cir. 1992) ....................................16

*Airline Prof. Ass'n v. APX Air, Inc.*, 400 F.3d 411, 415-16 (6th Cir. 2005) ...........................16

*ALPA v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1524 (D.C. Cir. 1989)...........................15,16

*ALPA v. Alaska Airlines, Inc.*, 898 F.2d 1393 (9th Cir. 1990)......................................16

*ALPA v. Guilford Transp. Indus., Inc.*, No. 04-2409, 2005 U.S. App. LEXIS 3394 (1st Cir. Feb. 28, 2005) ..........................................16

*APA v. ABX Air, Inc.*, 274 F.3d 1023 (6th Cir. 2001) ................................16

*APA v. American Airlines, Inc.*, 898 F.2d 462, 464-65 (5th Cir. 1990)....................................16

*BLE v. Atchison, T. & S.F. Ry.*, 768 F.2d 914, 920 (7th Cir. 1985) ........................................15

*BLE v. Burlington N. R.R.*, 838 F.2d 1102, 1111 (9th Cir. 1988) .........................................15

*BLE v. Long Island R.R..*, 85 F.3d 35 (2d Cir. 1996)...................................16

*BMWE v. Atchison, T & S.F. Ry.*, 840 F. Supp. 1221, 1236 (N.D. Ill. 1993) ...........................22

*BMWE v. Union Pacific R.R.*, 19 F, App'x 731 (10th Cir. 2000) ...........................................16

*BRAC v. Atchison, T. & S.F. Ry.*, 847 F.2d 403 (7th Cir. 1988) .......................................16

*BRC v. Missouri Pac. R.R.*, 944 F.2d 1422, 1429 (8th Cir. 1991)........................................16,17

*Brotherhood of R.R. Trainmen v. Chicago River & I.R.R.*, 353 U.S. 30, 39, 42 & n.24 (1957) .........................................6,13,14

*BRS v. Burlington N. R.R.*, 829 F.2d 617 (7th Cir. 1987) ........................................16

*BRS v. Burlington N. R.R.*, 893 F.2d 199, 205 (8th Cir. 1990) .................................15

*Buchanan v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975)........................13

*Burlington N. R. R. v. BMWE*, 961 F.2d 86, 87 & n.3 (5th Cir. 1992) ...........................14

*Burlington N. R.R. v. UTU*, 862 F.2d 1266 (7th Cir. 1988).....................................16

*Burlington N. S. F. Ry. v. BMWE*, 143 F. Supp. 2d 672, 678 (N.D. Tex. 2001) .....................17

*Chicago & N.W.  v. IBEW*, 829 F.2d 1424 (7th Cir. 1987)........................................16

*Chicago & N.W. Transp. Co. v. RLEA*, 855 F.2d 1277, 1288 (7th Cir. 1988).........................21

*Chicago & N.W. Transp. Co.*, 908 F.2d at 153 ........................................16

*Chicago & N.W. v. Railway Labor Executives' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990).......22

*Consolidated Rail Corp. v. RLEA*, 491 U.S. 299, 303-04, 312 (1989)..............................passim

*Empresa Ecuatoriana de Aviacion v. Machinists*, 690 F.2d 838, 843 (11th Cir. 1982)............16

*General Committee of Adjustment, UTU v. CSX R.R.*, 893 F.2d 584, 593 (3d Cir. 1990) ........15

*Int'l Bhd. of Teamsters v. Southwest Airlines Co.*, 875 F.2d 1129, 1133-34 (5th Cir. 1989)......................................................14

*Long Island R.R. v. IAMAW*, 709 F. Supp. 376, 387-88 (S.D.N.Y. 1989)...............................17

*NRLC v. IAM*, 830 F.2d 741, 749 (7th Cir. 1987) ....................................15

*RLEA v. Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990)........................................16

*RLEA v. Chesapeake Western Ry.*, 738 F. Supp. 1544, 1555 (E.D. Va. 1990).......................17

*RLEA v. Norfolk & Western R.R.*, 833 F.2d 700, 705 (7th Cir. 1987)...............................15,16

*Ruby v. TACA Int'l Airlines, S.A.*, 439 F.2d 1359, 1363 n.5 (5th Cir. 1971) ...........................14

*Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1414 (8th Cir. 1997).................................15

*Sheet Metal Workers Int'l Ass'n  v. Kansas City Southern Railway*, No. 09-CV-00091-DGK, 2009 U.S. Dist. LEXIS 104376, at *13 (W.D. Miss. Nov. 9, 2009) ..........................17

*SMWIA v. Burlington N. R.R.*, 893 F.2d 199 (8th Cir. 1990)..................................16

*Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 579 (1960) .................................................15

*Texas & N.O.R.R. v. Brotherhood of Ry. Clerks*, 281 U.S. 548, 565 (1930) ...........................13

*Texas Int'l Airlines v. Air Line Pilots Ass'n*, 518 F.Supp. 203, 214 (S.D. Tex. 1981)...............21

*Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 94 (1978) .................................................................15

*UTU v. CSX*, 893 F.2d 584 (3d Cir. 1990) ...............................................................................16

*UTU v. South Carolina Public Railway Comm.*, 130 F.3d 627, 636 (4th Cir. 1997) ...............17

## STATUTES

29 U.S.C. § 101.............................................................................................................................13

45 U.S.C. § 151...............................................................................................................................6

45 U.S.C. § 151a(1) .......................................................................................................................13

45 U.S.C. § 152 Seventh ...............................................................................................................14

45 U.S.C. § 153................................................................................................................................6

45 U.S.C. § 153 First (i) ...............................................................................................................13

## TREATISES

THE RAILWAY LABOR ACT, ABA Section of Labor and Employment Law (2d ed. 2005)
    at 390-92....................................................................................................................................17

**Introduction and Summary**

Plaintiff, the BNSF Railway Company ("BNSF") is seeking a temporary restraining order ("TRO") and a preliminary injunction against an illegal strike threatened by defendant, the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD" or "the Union").  The Union's strike threat arises in connection with a dispute over whether BNSF is properly calculating compensation for "on-call" time under the terms of the applicable collective bargaining agreement.  BNSF contends that its method of calculating such payments is consistent with both the explicit language of the agreement and a past practice dating back over nine years.  The Union denies BNSF's practice of calculating these payments complies with the parties' collective bargaining agreement.

The issue before the Court is not who is right or wrong about the merits, but only whether this dispute should be classified as "major" or "minor" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*  A dispute is "minor" if it implicates the "interpretation or application" of a collective bargaining agreement.  45 U.S.C. § 153 First (i).  Thus, if a railroad asserts that a disputed action is permissible under its labor agreements, the dispute must be deemed minor unless the railroad's proffered interpretation of the agreement is "frivolous or obviously insubstantial." *Consolidated Rail Corp. v. RLEA*, 491 U.S. 299, 303-04, 312 (1989) ("*Conrail*"). Minor disputes must be submitted to final and binding arbitration, and unions should be enjoined from using self-help to evade this obligation to arbitrate. *Brotherhood of R.R. Trainmen v. Chicago River & I.R.R.*, 353 U.S. 30, 39, 42 & n.24 (1957) ("*Chicago River*").

In this case, the parties' dispute is properly classified as minor because BNSF's contractual position is at least "arguably justified" and is hardly "frivolous."  *Conrail*, 491 U.S. at 304.  As shown in detail below, BNSF's position concerning how it calculates these payments is fully justified by (1) the language of applicable agreement (the "Guaranteed Conductors and

Brakemen's Extra Boards" Agreement), and (2) past practice of the parties dating back at least nine years.   Thus, in short, the Union's challenge to BNSF's actions requires an interpretation of the language of the relevant agreement and historical practice.   Accordingly, it is a matter that must be handled in arbitration.

Because the underlying dispute is minor, the threatened job action by the Union would be unlawful.   In these circumstances, the balance of harms and the public interest support an injunction.   Rail strikes—even of brief duration—cause devastating, irreparable harm to the carrier, its customers, other railroads, and the general public.   Verified Complaint ("V.C.") ¶¶ 18-20.   By contrast, the Union and the employees will suffer no harm whatsoever from an injunction; if the railroad's interpretation of the parties' agreement is ultimately deemed incorrect, the employees can obtain a remedy through arbitration.   Thus, this Court should issue a temporary restraining order against strikes by the Union until a hearing can be held and an order entered on BNSF's motion for a preliminary injunction.

# I.     Statement of Facts

## A.     The Parties

BNSF is one of the nation's major freight railroads.  The carrier has more than 46,000 employees and operates more than 1,000 trains every day over 32,500 miles of track in twenty-eight states.  It serves thousands of industrial and commercial customers, many of whom have no other access to rail transportation.  *See* V.C. ¶¶ 4, 6.

The Union represents a craft of conductors and brakemen who work for BNSF. These employees assist with the movement of trains that operate across the BNSF system.  V.C. ¶¶ 5, 6.

## B.     Collective Bargaining Agreement Governing Pay for On-Call Time

There are a number of collective bargaining agreements in place between BNSF and the employees represented by the Union.  One of those agreements dictates how BNSF will compensate certain conductors and brakemen for on-call time.  V.C. ¶ 7.

The Agreement is titled "Guaranteed Conductors and Brakemen's Extra Boards."[1] Under the Agreement, conductors and brakemen may be assigned to one of several lists called "guaranteed extra boards." While assigned to one of these boards, an employee must be available to report for work and operate a train should he or she receive a call from a BNSF crew caller. These employees receive a guaranteed payment (or "guarantee") for being available for call regardless of whether they are called to work.  V.C. ¶ 8.

---

[1] A copy of the Guaranteed Conductors and Brakemen's Extra Boards Agreement is included in Plaintiff BNSF Railway's Appendix in Support of its Motion for a Temporary Restraining Order ("Plaintiff's Appendix") at pages 1-10. (This particular agreement was entered into between predecessors of BNSF and the SMART-TD (the Atchison, Topeka and Santa Fe Railway and the United Transportation Union, respectively).)

## C.      Calculating Pay for On-Call Time ("Guarantees")

The amount of pay an employee receives for time spent on a guaranteed extra board depends on the several factors.  One of those factors is how much time the employee is assigned to a guaranteed extra board during a half-month pay period:

- If the employee is assigned to a single guaranteed extra board *for the entire pay half*, he or she qualifies for the full payment (or "guarantee") for that board.

- However, if the employee is *not* assigned to the same guaranteed extra board for the entire pay half (if, for example, the employee moves between extra boards during the half or if the employee moves from a non-extra-board position to an extra board), then the employee qualifies to receive 1/15 of the guarantee for each day he is marked up and available for service on each guaranteed extra board. V.C. ¶ 10

This practice comes directly from the explicit language of the Agreement.  Specifically, paragraph b. provides that each employee "who is available for service an entire half month will be guaranteed" a full payment.[2]  Paragraph c. dictates what happens when an employee is on a board for less than an entire half month:  "The guarantee for employees added to or removed from the board on dates other than the 1st and 16th will be equivalent to 1/15 of the half month guarantee for each full calendar day they are available on the board."[3]

## D.      BNSF's Past Practice of Computing Guarantees

BNSF's current practice of computing payments for time spent on guaranteed extra boards dates back at least nine years. An email dated June 13, 2006, is contemporaneous evidence of this longstanding practice.[4]  In the email, a Director from BNSF's Compensation Systems Department communicated with former SMART-TD General Chairman, Jim Huston,

---

[2] Plaintiff's Appendix at 1, ¶b.

[3] Plaintiff's Appendix at 1, ¶c.

[4] Plaintiff's Appendix at 11-13 (copy of the June 15, 2006 email from M. Prellwitz (BNSF) to General Chairman Jim Huston (SMART-TD)).

that "[a]n employee assigned to the guaranteed extra board the entire half . . . should be processed for a full half guarantee," but an employee who was *not* on "the same board the entire half . . . reverted to a daily guarantee."[5]  V.C. ¶11.

BNSF contends that this longstanding practice, as well as the explicit language of the Agreement itself, support its method of calculating guarantees.

## E.      The Union's Position

The Union contends that the Agreement does not permit BNSF's method of calculating guarantees when an employee spends less than an entire pay half on a guaranteed extra board. According to the Union, when an employee moves from one extra board to another, the employee does not revert to a daily guarantee but instead gets the full rate. V.C. ¶ 13.

What the Union completely overlooks is that extra boards are guaranteed at different rates of pay and, with the exception of paragraph c. in the Agreement, there is no mechanism for apportioning pay for time on one board with pay for time on another board.  For example, a conductor's extra board is guaranteed at 21 basic days per pay half whereas a switchman's extra board is guaranteed at 12 basic days per pay half.  So, while paragraph c. directly addresses moves from one board to another, it also provides a mechanism to apportion the pay for time on each board; that is, 1/15 for each day on each board. V.C. ¶ 14.

The dispute boils down to the fact that the Union dislikes the result of converting to the daily rate of guarantee (1/15) during the short 13-day pay half for the second half of February. (The Union does not appear to be appeased by the fact that this application benefits employees seven months out of the year.) V.C. ¶ 15.

---

[5] Plaintiff's Appendix at 11-13 (email).

**F.      The Threatened Work Stoppages**

The Union has refused to provide a no-strike assurance.  In an email on March 31, 2015, the Union's General Chairman, D.L. Young, stated that he believed BNSF's act of paying the guarantee under the long-standing calculations provided under paragraph c. was "a unilateral change in the agreement," which is code in the industry that it could justify a strike.  On April 1, 2015, BNSF asked the Union, in light of Mr. Young's language, to provide assurance that the issue is minor and that the Union did view this as a minor dispute.   As of the filing of these pleadings, the Union had declined to provide such an assurance.  In the railroad's experience, this means that the Union is reserving to itself the right to use self-help if BNSF continues to compute payments for on-call time as it has in the past.   V.C. ¶ 16.

**G.      The Balance of Harms**

A strike by the Union will likely shut down or seriously impair some portion of BNSF's operations.  As a result, BNSF will suffer immediate and irreparable injury.  BNSF will be deprived of the use of its tracks and equipment, facilities, and revenues for the duration of the strike.  In addition, strikes by the Union will cause immediate, substantial, and lasting disruptions to BNSF's schedules, most likely resulting in delays long after any strike is ended.  This will cause a substantial loss of business for BNSF, both during the duration of the work stoppage and during the period of lingering delays after it ends.  Moreover, delays and disruptions resulting from a strike or other self-help by the Union will likely cause BNSF to suffer a loss of customer goodwill and future business.  V.C. ¶ 18.

A strike or other self-help by the Union will also cause substantial, immediate, and irreparable harm to other rail carriers, many of whom interchange traffic with BNSF.  Because a

strike against BNSF will disrupt these interchanges, the effects of the strike will quickly ripple through the rail networks of the other major carriers.  V.C. ¶ 19.

Furthermore, any strike or other self-help by the Union will also cause substantial, immediate, and irreparable harm to shippers, commuters, and the general public.  Every day, BNSF and the other major railroads move substantial quantities of food, fuel, mail, consumer goods, and other freight essential to public health and safety.  A strike would interfere with or halt deliveries of these vital products to consumers, distributors, public utilities, and other markets throughout the country, causing potentially serious damage to the nation's economy.  Moreover, a strike or other illegal self-help by the Union could adversely impact commuter operations in Chicago, Minneapolis, Seattle and elsewhere, causing serious delays and hardship for the general public.  V.C. ¶ 20.

## II.    Argument

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable injury pending a hearing on a preliminary injunction.  Under the law of this Circuit, preliminary injunctive relief is appropriate if (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) there is a substantial threat of irreparable injury, (3) the threatened harm outweighs any injury that the injunction may do to the defendant, and (4) the public interest supports an injunction.  *See, e.g.*, *Buchanan v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975).  As we now show, this standard is clearly met in this case.

## A.    Applicable Legal Principles for Classification of Rail Labor Disputes.

The "major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes'" in order to "safeguard the vital interests of the country" in uninterrupted rail service.  *Texas & N.O.R.R. v. Brotherhood of Ry. Clerks*, 281 U.S. 548, 565 (1930); *see also* 45 U.S.C. § 151a(1).  Thus, where the RLA has channeled particular types of labor-management disputes into peaceable procedures for resolution, strikes are unlawful and should be enjoined, notwithstanding the limitations imposed by the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 *et seq.  See Chicago River*, 353 U.S. at 40-42 (holding that NLGA must be accommodated to the RLA to allow courts to issue injunctions against strikes).

Section 3 of the RLA channels all disputes over the "interpretation or application" of labor agreements to final and binding arbitration.  45 U.S.C. § 153 First (i).  Arbitral boards have exclusive jurisdiction to resolve the merits of these so-called "minor disputes."  *Conrail*, 491 U.S. at 304.  When a union attempts to strike over a minor dispute, it amounts to an effort to force a resolution without arbitration.  Thus, strikes over minor disputes violate Section 3 of the

RLA and may be enjoined.  *Chicago River*, 353 U.S. at 39, 42 & n.24; *Burlington N. R. R. v. BMWE*, 961 F.2d 86, 87 & n.3 (5th Cir. 1992).

Faced with this limit on the right to strike, a rail union—like the Union in this case—will often claim that its interpretation of the agreement is so plainly right, and the carrier's so wrong, that the carrier's proffered interpretation is just a sham designed to cover up an attempted "unilateral change" in the collective bargaining agreement, which would be unlawful under § 2 Seventh of the RLA.  45 U.S.C. § 152 Seventh.  In such circumstances, the union will argue, the case presents a "major dispute," not a minor dispute.  Thus, the union claims, it has the right to strike rather than arbitrate.

However, in its landmark *Conrail* decision, the Supreme Court held that when a railroad and a union differ over the taxonomy of a labor dispute, the dispute must be classified as a "minor dispute" unless the railroad's proffered interpretation is not "arguably justified" and is "frivolous" "or obviously insubstantial."  491 U.S. at 306.  The Court explained as follows:

> Verbal formulations of [the legal test for identifying minor disputes] have differed over time and among the Circuits: phrases such as "'not arguably justified,' 'obviously insubstantial,' 'spurious,' and 'frivolous' have been employed."  These locutions are essentially the same in their result.  They illustrate the relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA.  "To the extent that abstract words can deal with concrete cases, we think that the concept embodied in the language adopted by these . . . Courts of Appeals is correct."  Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Id.* at 306-07 (citations omitted).[6]

---

[6] *See also Int'l Bhd. of Teamsters v. Southwest Airlines Co.*, 875 F.2d 1129, 1133-34 (5th Cir. 1989) (en banc) (dispute is minor if carrier's interpretation is "arguable"); *Ruby v. TACA Int'l Airlines, S.A.*, 439 F.2d 1359, 1363 n.5 (5th Cir. 1971) (holding that dispute is major only if carrier's interpretation is "wholly spurious").

In applying the *Conrail* test, a court should be mindful that "[i]t is the role of the arbitrator, not the court, to choose between the parties' interpretations of the Agreement." *ALPA v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1524 (D.C. Cir. 1989).  Moreover, while technically the railroad has a "relatively light" burden to show that a dispute is minor, as a practical matter there is a strong presumption in favor of minor disputes.  *See, e.g., BLE v. Atchison, T. & S.F. Ry.*, 768 F.2d 914, 920 (7th Cir. 1985) (courts err in favor of finding disputes to be minor); *see also Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1414 (8th Cir. 1997) ("[T]here is a presumption that disputes between railroads and their unionized employees are minor, and thus, arbitrable.") (citing *Conrail*, 491 U.S. at 307).  Indeed, "if there is any doubt as to whether a dispute is major or minor, a court will construe the dispute to be minor." *RLEA v. Norfolk & Western R.R.*, 833 F.2d 700, 705 (7th Cir. 1987); *see also BLE v. Burlington N. R.R.*, 838 F.2d 1102, 1111 (9th Cir. 1988) ("When in doubt, courts construe disputes as minor.").[7]

This means that a carrier's interpretation should not be deemed frivolous if it is "questionable" or "improbable," or even if the court believes that it is affirmatively wrong.  *See NRLC v. IAM*, 830 F.2d 741, 749 (7th Cir. 1987); *BRS v. Burlington N. R.R.*, 893 F.2d 199, 205 (8th Cir. 1990).  In fact, virtually every court of appeals to face the "major/minor" question in the

---

[7] There are at least two independent policy considerations that support this presumption.  First, "[r]eferring arbitrable matters to the Board will help to 'maintain agreements,' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in the 'common law of [the] particular industry.'" *Conrail*, 491 U.S. at 310 (quoting *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 579 (1960)); *see also ALPA*, 869 F.2d at 1522 ("Construing the 'common law of a particular industry' is a question of contract interpretation within the expertise and authority of an arbitrator, not the court.").  Second, if the employees' position is sustained, the arbitrator could make them whole.  *General Committee of Adjustment, UTU v. CSX R.R.*, 893 F.2d 584, 593 (3d Cir. 1990) ("In minor disputes, the Board has full authority to resolve the matter and can grant a complete and adequate remedy to the prevailing party.").  Thus, employees' rights are protected when matters are resolved through arbitration, without burdening already overstrained courts with the many thousands of disputes over interpretation and application of railroad collective bargaining agreements that arise each year.  *See Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 94 (1978) (noting that one of the purposes of the RLA is "keep[ing] these so-called 'minor' disputes within the Adjustment Board and out of the courts").

last twenty years has concluded that any good-faith interpretation of an agreement cannot be

dismissed as "frivolous."[8]  The few cases that did find a carrier's interpretation to be "frivolous"

all involved situations where the circumstances, above and beyond just a poor contractual

argument, made it evident that the carrier was repudiating its contract.[9]

The *Conrail* test has been applied in a number of cases where the underlying dispute

turns on interpretation of implied contractual terms, or even on the absence of contractual

terms.[10]  *See, e.g.*, *Conrail*, 491 U.S. at 313 (finding dispute to be minor because it turned on

"implied contractual terms, as interpreted in light of past practice").  In particular, in cases when

a carrier has relied on contractual silence to argue that it retains the right to act unilaterally,

courts have routinely deemed the disputes to be minor.  *See, e.g.*, *Airline Prof. Ass'n v. APX Air,*

*Inc.*, 400 F.3d 411, 415-16 (6th Cir. 2005) (where CBA is silent on disputed point, dispute is

minor); *Chicago & N.W. Transp. Co.*, 908 F.2d at 153 (same); *Empresa Ecuatoriana de Aviacion*

*v. Machinists*, 690 F.2d 838, 843 (11th Cir. 1982) (disputes about extent of managerial

prerogatives are minor disputes).

---

[8] *See, e.g.*, *ALPA v. Guilford Transp. Indus., Inc.*, No. 04-2409, 2005 U.S. App. LEXIS 3394 (1st Cir. Feb. 28, 2005); *AFA v. Horizon Air Indus., Inc.*, 280 F.3d 901 (9th Cir. 2001); *APA v. ABX Air, Inc.*, 274 F.3d 1023 (6th Cir. 2001); *BMWE v. Union Pacific R.R.*, 19 F, App'x 731 (10th Cir. 2000); *BLE v. Long Island R.R..*, 85 F.3d 35 (2d Cir. 1996); *AFA v. United Airlines*, 976 F.2d 102, 105 (2d Cir. 1992); *BRC v. Missouri Pac. R.R.*, 944 F.2d 1422, 1429 (8th Cir. 1991); *RLEA v. Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990); *ALPA v. Alaska Airlines, Inc.*, 898 F.2d 1393 (9th Cir. 1990); *APA v. American Airlines, Inc.*, 898 F.2d 462, 464-65 (5th Cir. 1990); *UTU v. CSX*, 893 F.2d 584 (3d Cir. 1990); *SMWIA v. Burlington N. R.R.*, 893 F.2d 199 (8th Cir. 1990); *ALPA v. Eastern Air Lines*, 869 F.2d 1518 (D.C. Cir. 1989); *Chicago & N.W.  v. IBEW*, 829 F.2d 1424 (7th Cir. 1987); *BRS v. Burlington N. R.R.*, 829 F.2d 617 (7th Cir. 1987); *RLEA v. Norfolk & W. Ry.*, 833 F.2d 700 (7th Cir. 1987); *BRAC v. Atchison, T. & S.F. Ry.*, 847 F.2d 403 (7th Cir. 1988); *NRLC v. IAM*, 830 F.2d 741 (7th Cir. 1987).

[9] *See, e.g.*, *Burlington N. R.R. v. UTU*, 862 F.2d 1266 (7th Cir. 1988) (railroad's interpretation reflected changes to agreement that it was unable to obtain in negotiation with union).

[10] It is well-settled that railroad labor agreements include both express and implied terms.  *See, e.g.*, *RLEA v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987) ("Within the railroad industry, in particular, it is common practice to omit from written agreements non-essential practices that are acceptable to both parties.  The parties' collective bargaining agreement, therefore, includes both the specific terms set forth in the written agreement and any well established practices that constitute a 'course of dealing' between the carrier and employees.").

In classifying a dispute as major or minor under the *Conrail* standard, a court may and should assess the sufficiency of the carrier's interpretation in light of any source or justification that an arbitrator might employ in deciding the merits of the dispute.  Thus, courts routinely examine a variety of factors beyond the text of the agreement itself, including the "parties' 'practice, usage and custom,'" bargaining history, analogous agreements, arbitration awards, and the like.  *BMWE*, 138 F.3d at 641; *see also General Committee*, 893 F.2d at 591-92; THE RAILWAY LABOR ACT, ABA Section of Labor and Employment Law (2d ed. 2005) at 390-92 (collecting cases).

Moreover, in making this determination, a court need not, and indeed may not, resolve factual questions arising from the dispute.  Rather, factual issues must be left for arbitration. *See, e.g.*, *Long Island R.R. v. IAMAW*, 709 F. Supp. 376, 387-88 (S.D.N.Y. 1989) ("factual dispute" over the content of the parties' "working relationship" was an issue to be decided in arbitration); *BRC v. Missouri Pacific R.R.*, 944 F.2d 1422, 1429 (8th Cir. 1991) (fact dispute about current work assignment practices is a minor dispute); *Sheet Metal Workers Int'l Ass'n  v. Kansas City Southern Railway*, No. 09-CV-00091-DGK, 2009 U.S. Dist. LEXIS 104376, at *13 (W.D. Miss. Nov. 9, 2009) ("questions of fact" are "for the arbitrator to resolve").

Finally, a railroad may continue to apply its interpretation of the agreement or make a disputed change during the pendency of a minor dispute. *Conrail*, 491 U.S. at 310.  The Supreme Court "never has recognized a general statutory obligation on the part of an employer to maintain the status quo pending" an adjustment board's resolution of a minor dispute. *Conrail*, 491 U.S. at 310.[11]

---

[11] *See also Burlington N. S. F. Ry. v. BMWE*, 143 F. Supp. 2d 672, 678 (N.D. Tex. 2001) (noting that "subject of minor dispute can be implemented pending arbitration"); *UTU v. South Carolina Public Railway Comm.*, 130 F.3d 627, 636 (4th Cir. 1997) (same); *RLEA v. Chesapeake Western Ry.*, 738 F. Supp. 1544, 1555 (E.D. Va. 1990) (same), *aff'd in part*, 915 F.2d 116 (4th Cir. 1990).

**B.    The Parties' Dispute in This Case is Minor.**

The Union's challenge to BNSF's method of calculating pay for time spent on a guaranteed extra board is a paradigmatic minor dispute. The dispute involves the meaning or application of the parties' Agreement, and BNSF has two, independent, non-frivolous arguments that it is not in breach of that Agreement.

**1.    The Language of the CBA Supports BNSF's Method of Calculating Guarantees.**

BNSF's method of calculating guarantees is based on the explicit language of the applicable collective bargaining agreement—the "Guaranteed Conductors and Brakemen's Extra Boards" Agreement.

Paragraph b support's BNSF's practice of providing the full guarantee to an employee who was on the guaranteed extra board for the entire pay half:[12]

> b.    Each road extra board employee who is available for service an entire half month will be guaranteed a monetary equivalent of 21 days pay at the conductors' minimum basic through freight rate, for conductors' extra boards and 21 days pay at the trainman's minimum basic through freight rate for brakemen's extra boards, subject to future general wage increases and COLA adjustments. In the event all earnings (exclusive of penalty time claims) do not equal or exceed this amount, necessary adjustment will be made in the subsequent payroll period. The guarantee will be reduced by 1/15 for each calendar day or portion thereof the employee is unavailable for service.

For an employees who is not on the same guaranteed extra board for the entire pay half, Paragraph c supports BNSF's practice of paying him or her 1/15 of the guarantee for each day the employee was on the guaranteed extra board.[13]

---

[12] Plaintiff's Appendix at 1, ¶ b (emphasis added).

[13] Plaintiff's Appendix at 1, ¶ c.

> c.   The guarantee for employees added to or removed from the board on dates other than the 1st and 16th will be equivalent to 1/15 of the half month guarantee for each full calendar day they are available on the board.

Given the explicit language of these provisions, BNSF's interpretation of them cannot be considered "frivolous" or a "*de facto* repudiation of the contract," such that it would serve as the basis for a "unilateral change" or major dispute.

### 2. Past Practice Supports BNSF's Method of Calculating Guarantees.

BNSF's interpretation is also consistent with past practice of the parties. BNSF's current practice of computing payments for time spent on guaranteed extra boards dates back at least nine years. An email dated June 13, 2006, is contemporaneous evidence of this longstanding practice.[14]   In the email, a Director from BNSF's Compensation Systems Department communicated with former SMART-TD General Chairman, Jim Huston, that "[a]n employee assigned to the guaranteed extra board the entire half . . . should be processed for a full half guarantee," but an employee who was *not* on "the same board the entire half . . . reverted to a daily guarantee."[15]  V.C. ¶11.  This longstanding past practice of computing guarantee using the actual number of days in the denominator supports BNSF's interpretation of the Agreement.

### 3. Therefore, these disputes are clearly minor and must be resolved under the RLA.

As set forth in the Verified Complaint and the statement of facts above, there is no serious question that this dispute between BNSF and the Union is 'minor" under the RLA. BNSF's position is supported by the express language in the Agreement and past practice—

---

[14] Plaintiff's Appendix at 11-13 (email).

either one of which gives BNSF a "non frivolous" argument.   And that "non frivolous" argument, under *Conrail,* is all BNSF needs for this dispute to be "minor."   If the Union is dissatisfied with BNSF's contract interpretation, its remedy is to proceed to file claims and progress the dispute to the NRAB as Congress mandated in Section 3 First(i) of the RLA.  45 U.S.C. § 153 First (i).  Because BNSF's actions are, at a minimum, arguably justified by the existing agreement and past practice, the overwhelming weight of authority dictates that this dispute is minor.  It is therefore subject to compulsory and binding arbitration under the RLA.

### C.   The Balance of Harms and the Public Interest

The balance of harms and the public interest clearly favor issuance of a temporary restraining order here because they weigh entirely on the side of BNSF.  A strike against a railroad results in a shutdown of its operations, deprives it of the use of its track and facilities and of the income it would earn from such operations, as well as depriving employees of their work.  As described above in the Statement of Facts, a strike or other self-help by the Union over the issue of whether BNSF is properly calculating guarantee pay for a group of conductors and trainmen would inflict massive, immediate, and irreparable harm on BNSF.  *See supra* at pp. 8-9.  Much or all of BNSF's expansive rail transportation will be affected if a work stoppage is allowed.  BNSF would lose millions of dollars of revenue without any adequate remedy to recover the losses.  Moreover, a loss of good will and commercial confidence in BNSF by shippers that will result if a work stoppage is allowed cannot be measured in dollars, and for which there is no adequate compensation at law.[16]  Further, due to the competitive nature of the rail intermodal service, much of BNSF's intermodal traffic could be permanently diverted to

---

[15] Plaintiff's Appendix at 11-12 (email).

competing modes of transportation.

Perhaps more importantly, the harm from a strike would be felt far beyond the BNSF system. BNSF interchanges with every major freight railroad in the United States. A strike on BNSF would therefore soon affect operation on the other major carriers. Members of the public who rely on rail transportation would also be affected. For example, the U.S. Postal Service, United Parcel Service, and other package delivery services are among BNSF's customers. When trains carrying their shipments cannot move, the mails are delayed, causing all manner of secondary injuries. Moreover, BNSF serves as a key link between a number of major U.S. markets. Even a brief shutdown would interfere with the shipment of a wide range of commodities, from chemicals to cars; the impact of this disruption would be felt throughout the economy. In short, a strike by the Union would irreparably injure both the carrier and its employees, as well as the public generally, by interfering with the interstate commerce of passengers, mail, military personnel and material, food, fuel, and other freight and personnel essential to the public health and safety. *See* V.C. ¶¶ 18-20.

There is nothing to weigh on the other side of the equitable scale. Employees will suffer no harm whatsoever if they are enjoined from unlawful strikes over this dispute. In no way does this motion decide the merits of the Union's claims. If the Union's interpretation of the collective bargaining agreement is correct, employees will have an adequate remedy in arbitration, including make whole relief. *See Conrail*, 491 U.S. at 310 n.8; *see also Chicago & N.W. Transp. Co. v. RLEA*, 855 F.2d 1277, 1288 (7th Cir. 1988) (rejecting employees' argument that their remedies under arbitration are inadequate on the ground that the Board would be "able to order the necessary payment of monies and adjustments in seniority levels it deems necessary

---

[16] *See, e.g., Texas Int'l Airlines v. Air Line Pilots Ass'n*, 518 F.Supp. 203, 214 (S.D. Tex. 1981) (requisite irreparable harm found in the loss of good will and consumer confidence following a strike over

to make those employees whole.").

By contrast, neither BNSF nor the public has any way of making up for the devastating losses that result from even a short work stoppage.  As Judge Posner has explained, carriers are "peculiarly vulnerable" to strikes because of their inability to recover from interruptions to operations:

> [u]nlike manufacturing industries and even some service industries, the transportation industry does not produce a storable commodity, and so it cannot produce for inventory in anticipation of a strike or accelerate production afterward to make up for lost production during the strike.

*Chicago & N.W. v. Railway Labor Executives' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990).

This Court has authority to enjoin a strike before one begins.  A district court expressly rejected a railroad union's argument to the contrary:

> The Court also concludes that it would be proper at this time to enjoin any strike or other form of self-help by the BMWE over the above-reference[d] disputes. . . . Despite the BMWE's protestations to the contrary, the BMWE has provided sufficient indication that it intends to strike over these disputes for the Court to conclude that there is an imminent threat.  We do not believe that it serves any purpose to force the Railroads to wait until the trigger is pulled before seeking the protection to which they are entitled consistent with this decision.

*BMWE v. Atchison, T & S.F. Ry.*, 840 F. Supp. 1221, 1236 (N.D. Ill. 1993).  In this case, the Union has likewise provided "sufficient indication" that it reserves the right to engage in a strike or other form of self-help; this Court need not wait until "the trigger is pulled" before issuing an order.

In sum, the carrier and the public interest will suffer irreparable harm from strikes by the Union over this issue of calculating guarantees, whereas the SMART-TD will suffer no harm at all if such strikes are enjoined.  Thus, this Court should temporarily restrain the Union from striking over the dispute about BNSF's method of calculating guarantees under the Agreement.

a minor dispute).

### III.   CONCLUSION

For the reasons stated herein, BNSF's motion for a temporary restraining order should be granted.

Date: April 2, 2015.

Respectfully submitted,

David M. Pryor
   Texas State Bar No. 00791470
Andrea Hyatt
   Texas State Bar No. 24007419

BNSF Railway Company
2500 Lou Menk Drive, AOB-3
Fort Worth, Texas  76131-2828
Telephone:  (817) 352-2286
Facsimile:  (817) 352-2399
E-mail:  david.pryor@bnsf.com

**Attorneys for Plaintiff BNSF Railway Company**

### CERTIFICATE OF SERVICE

I certify that on April 2, 2015, a true and correct copy of this document was served by facsimile and/or electronic mail on Kevin Brodar, Associate General Counsel, whom BNSF believes is lead counsel for the defendant, SMART-TD.

David M. Pryor